UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

In re:                                                            Chapter 11

231 Fourth Avenue Lyceum, LLC                 Case No. 13-42125 (CEC)

                        Debtor.

DECISION

APPEARANCES:

David M. Blum, Esq.                            Glenn P. Warmuth, Esq.
286 Madison Avenue, Suite 2200                 Stim & Warmuth, P.C.
New York, New York 10017                       2 Eighth Street
*Counsel for Debtor*                           Farmingville, New York 11738
                                               *Counsel for P.B. #7 LLC*

William E. Curtin, Esq.
United States Department of Justice
201 Varick Street, Suite 1006
New York, New York 10014
*Counsel for the United States Trustee*

CARLA E. CRAIG
Chief United States Bankruptcy Judge

This matter comes before the Court on the motion of P.B. #7 LLC ("P.B.") to lift the automatic stay, pursuant to 11 U.S.C. § 362(d)(3)[1]. Because 231 Fourth Avenue Lyceum, LLC has failed to file a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time, as required by § 362(d)(3), P.B.'s motion to lift the automatic stay is granted.

## JURISDICTION

This Court has jurisdiction of this core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (G), 28 U.S.C. § 1334, and the Eastern District of New York standing order of reference dated August 28, 1986, as amended by order dated December 5, 2012. This decision constitutes the Court's findings of fact and conclusions of law to the extent required by Federal Rule of Bankruptcy Procedure 7052.

## BACKGROUND

231 Fourth Avenue Lyceum, LLC (the "Debtor") commenced this case under chapter 11 of the Bankruptcy Code on April 11, 2013. The Debtor's principal asset is real property located at 227-231 4th Avenue, Brooklyn, New York (the "Property"), which is encumbered by a mortgage held by P.B. The Debtor defaulted on the mortgage and P.B. obtained a judgment of foreclosure and sale on September 28, 2012 (the "Foreclosure Judgment").

On the eve of the foreclosure sale, the Debtor filed this bankruptcy case. Other than the Property, the Debtor's only other assets are trolley cars having a value, according to the Debtor, between $30,000 and $300,000.[2] (Am. Proposed Disclosure Statement Dated 11/21/13; 13-

---

[1] Unless otherwise indicated, all statutory references are to the Bankruptcy Code, Title 11, U.S.C.
[2] Although the Debtor's amended disclosure statement also claims ownership of air rights and ownership of an adjacent lot, the record shows that efforts by the Debtor and the Debtor's principal in state court to acquire

42125-CEC, ECF No. 47 at 5.)[3] The Debtor's schedules include P.B.'s secured claim and $700,000 of unsecured claims, $300,000 of which is insider debt. The amount of P.B.'s secured claim, calculated in accordance with the Foreclosure Judgment, is approximately $6.6 million. (Affirmation in Supp. of Mot. for Relief from Stay Exs. E and F, 13-42125-CEC, ECF Nos. 56-5 and 56-6.)

Since filing, the Debtor's operating reports have shown that the Debtor has generated no income. (Monthly Operating Reports, Case No. 13-42125-CEC, ECF Nos. 16, 22, 23, 32, 62, 63, 64, and 65.) At the creditors' meeting pursuant to § 341, the Debtor's principal, Eric Richmond, stated that the Debtor leases the building to 231 Fourth Avenue Lyceum Inc. ("Lyceum Inc."), a related entity, for $6,000 a year and 25 percent of any profits that entity generates. (Affirmation in Supp. of Mot. to Authorize/Direct that this case is a Single Asset Real Estate Case Ex. I, Case No. 13-42125-CEC, ECF No. 18-9 at 19.) Lyceum Inc., in turn, rents the building out for various events. Id. The last time the Debtor received a portion of Lyceum Inc.'s profits was three years prior to the Debtor's bankruptcy filing. Id. at 18. Lyceum Inc. is listed in the Debtor's schedules as an unsecured creditor owed $300,000. The Debtor's Proposed Amended Disclosure Statement states that the Property grossed approximately $30,000 for the 30 days ending December 16, 2013. (Proposed Am. Disclosure Statement, Case No. 13-42125-CEC, ECF No. 59 at 6.) Furthermore, the Debtor projected that the Property would gross an additional $10,000 before the end of the year.[4] Id.

---

ownership of these assets have been unsuccessful. See Union St. Tower, LLC v Richmond, 84 A.D.3d 784 (N.Y. App. Div. 2011) (explaining the history of the disputed air rights and ownership rights of the adjacent lot).

[3] The Debtor's Amended Proposed Disclosure Statement Dated 11/21/13, as well as other documents submitted by the Debtor, were not paginated. In order to provide pinpoint citations to these documents, the Court treated the first page of each non-paginated document as page 1.

[4] This lease arrangement continues such that the revenue generated by the Property belongs to Lyceum Inc., not the Debtor. However, in its amended proposed disclosure statement dated November 22, 2013, the Debtor has stated that Lyceum Inc. will relinquish use of the Property within 30 days of the approval of the Plan, or that Lyceum Inc. will modify its agreement to assist the Debtor by paying all of its income, after expenses, to the Debtor. For the

On July 8, 2013, P.B. filed a motion to designate the Debtor as a single asset real estate debtor. (Mot. to Authorize/Direct that this case is a Single Asset Real Estate Case, Case No. 13-42125-CEC, ECF No. 17.) On November 1, 2013, after conducting several hearings, the Court entered an order designating the Debtor as a single asset real estate Debtor and directing the Debtor to comply with the provisions of § 362(d)(3) by filing "a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time", or by commencing monthly payments that "are in an amount equal to the then applicable nondefault contract rate of interest on the value of the creditor's interest in the real estate." (Order Granting Mot. for a Determination that this Case is a Single Asset Real Estate Case, Case No. 13-42125-CEC, ECF No. 42 at 1-2) (quoting § 362(d)(3)).

On November 22, 2013, the Debtor filed a first amended chapter 11 plan and disclosure statement (its initial disclosure statement having been rejected as insufficient by order dated November 1, 2013), as well as a motion seeking approval of the first amended disclosure statement and plan, which was amended on November 25, 2013. (Mot. to Authorize/Direct Entry of an Order Approving the Adequacy of the Debtor's Am. Proposed Disclosure Statement and Am. Proposed Reorganization Plan, Case No. 13-42125-CEC, ECF No. 46; Am. Notice of Mot. to Authorize/Direct Entry of an Order Approving the Adequacy of the Debtor's Am. Proposed Disclosure Statement and Am. Proposed Reorganization Plan, Case No. 13-42125-CEC, ECF No. 50.) On December 18, 2013, the Debtor filed a second amended chapter 11 Plan (the "Plan"), a second amended proposed disclosure statement (the "Disclosure Statement"), and an affirmation in further support of the Disclosure Statement and Plan. (Proposed Am. Disclosure Statement, Case No. 13-42125-CEC, ECF No. 59; Proposed Am. Chapter 11 Plan, Case No. 13-

---

purpose of analyzing the feasibility of the Plan, the Court will credit this representation, and will consider the Property's ability to generate income, not just the amounts payable to the Debtor under the lease with Lyceum Inc. (Am. Proposed Disclosure Statement; 13-42125-CEC, ECF No. 47 at 6-7.)

42125-CEC, ECF No. 60; Affirmation in Further Support, Case No. 13-42125-CEC, ECF No. 61.)[5]

The Plan proposes to pay 100% of claims owed to creditors over 60 months. (Proposed Am. Chapter 11 Plan, Case No. 13-42125-CEC, ECF No. 60 at 1.) The Plan states, incorrectly, that there are no impaired classes, as all claims are being paid in full.[6] Id. The Plan provides for P.B.'s claim, valued at $6,600,000, and includes proposed payments to satisfy the $700,000 in unsecured claims, future real estate taxes, insurance, utilities, and lease payments for a storage space housing the Debtor's trolley cars. Id. at 1-2. The monthly debt service payment provided in the Plan totals $56,300 per month for the 60 months of the plan. Id. Under the Plan, the Debtor would also be required to make a lump sum payment of $1,399,000 on the first day of every year from 2015 to 2018, with that amount increasing to $1,699,000 for the final lump sum payment due on January 1, 2019. Id. The Plan states that the Debtor will make these payments through income generated by the Property, investments by various theater and dance companies, long term leases of portions of the facility, possible investors/partners, refinancing of the business, income generated by the adjacent lot whose ownership is in dispute, and participation in an EB-5 program (a foreign investment program). Id. at 3. In addition, the Plan provides an estimated future income schedule that projects that the Debtor will generate gross monthly income of $30,000 after three months, $40,000 after 6 months, $50,000 after nine months, $54,000 after 12 months, $68,000 after 24 months, $85,000 after 36 months, $102,000 after 48 months, and $118,000 after 60 months. Id.

---

[5] Although the Plan and Disclosure statement were not filed until after the hearing on this motion, they will be considered, for the purposes of this motion, as though they had been timely filed.

[6] While the Plan purports to provide for payment to all creditors in full, creditors are not being paid in full upon confirmation of the Plan, nor are their claims being reinstated in accordance with § 1124, and all classes of creditors are therefore impaired. See 11 U.S.C. § 1124.

Case 1-13-42125-cec    Doc 76    Filed 02/28/14    Entered 03/03/14 11:03:56

5

On December 4, 2013, P.B. filed an objection to the Debtor's first amended disclosure statement and filed this motion seeking relief from the stay. (Affirmation in Opp'n to Disclosure Statement, 13-42125-CEC, ECF No. 53; Mot. for Relief from Stay, 13-42125-CEC, ECF No. 55; Affirmation in Supp. of Mot. for Relief from Stay, 13-42125-CEC, ECF No. 56.) On December 11, 2013, the United States Trustee also objected to the Debtor's first amended disclosure statement. (Objection of the United States Trustee to the Approval of the Debtor's Disclosure Statement, 13-42125-CEC, ECF No. 58.) A hearing was held on December 18, 2013.

## ARGUMENTS

The Debtor contends that the Plan is confirmable. The Debtor also asserts that the Foreclosure Judgment is not valid because P.B. did not obtain a judgment within the time period set forth in New York Civil Practice Law and Rules § 3215(c).

P.B. asserts that the Plan is unconfirmable because it is clearly not feasible. P.B. points out that the Debtor has not provided evidence of its ability to make either the monthly debt service payments of $56,300 or the annual lump sum Plan payments. P.B., also, correctly, objects to its designation as an unimpaired creditor.

The United States Trustee also objects to approval of the Disclosure Statement and the Plan because the Plan lacks feasibility and because the Debtor is attempting to deny impaired creditors the right to vote on the Plan by improperly characterizing them as unimpaired.

## DISCUSSION

A finding by the Court that a debtor's property constitutes "single asset real estate" within the meaning of § 101(51B) triggers the applicability of § 362(d)(3). See 11 U.S.C. 362(d)(3). Not later than 30 days from the entry of the order designating a debtor as subject to the provisions of § 362(d)(3), the debtor must file a plan of reorganization that has a reasonable

possibility of being confirmed within a reasonable time, or commence monthly payments to its secured creditor in an amount equal to at least the then applicable nondefault contract rate of interest on the value of the creditor's interest in the real estate. Id. Failure to file a plan or to commence monthly payments constitutes grounds for the secured creditor to obtain stay relief. Id.

The Debtor was designated a single asset real estate debtor by an order entered on November 1, 2013, after a hearing on October 16, 2013, which required, by November 22, 2013, the Debtor to commence monthly payments or to file a plan having a reasonable possibility of being confirmed within a reasonable time. (Order Granting Mot. for a Determination that this Case is a Single Asset Real Estate Case, Case No. 13-42125-CEC, ECF No. 42.) The Debtor has not made any monthly payments, but filed the first amended proposed plan of reorganization on November 22, 2013. The Debtor then filed the Plan on December 18, 2013.

A. The Plan Does not have a Reasonable Possibility of Being Confirmed Within a Reasonable Time

It is the Debtor's burden to prove that the Plan has a reasonable possibility of being confirmed within a reasonable time. See 11 U.S.C. § 362(g)(2) (stating that the party opposing relief from the automatic stay under § 362(d) has the burden of proof on all issues except the debtor's equity in the property); In re RYYZ, LLC, 490 B.R. 29, 35 (Bankr. E.D.N.Y. 2013).

For a court to approve confirmation of a plan of reorganization, the requirements of § 1129 must be met. See 11 U.S.C. § 1129. Among these requirements is that the plan must be feasible, such that "confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). The purpose of the feasibility test is "'to prevent confirmation of visionary schemes which

promise creditors and equity holders more under a proposed plan than the debtor can possibly attain after confirmation.' . . .. [W]here the financial realities do not support the proposed plan's projections or where proposed assumptions are unreasonable, confirmation of the plan should be denied." In re Investors Fla. Aggressive Growth Fund, Ltd., 168 B.R. 760, 765 (Bankr. N.D. Fla. 1994) (quoting In re Lakeside Global II, Ltd., 116 B.R. 499, 507 (Bankr. S.D. Tex. 1989)); see In re Prudential Energy Co., 58 B.R. 857, 862 (Bankr. S.D.N.Y. 1986) (a plan based on impractical or visionary expectations cannot be confirmed).  "Sincerity, honesty, and willingness are not sufficient to make the plan feasible, and neither are any visionary promises. The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts."  Chase Manhattan Mortg. & Realty Trust v. Bergman (In re Bergman), 585 F.2d 1171, 1179 (2d Cir. 1978).

In RYYZ 490 B.R. 29, Judge Feller delineated the standard that a debtor must meet under § 362(d)(3) in order to show that a plan has a reasonable possibility of being confirmed within a reasonable time:

> [T]he debtor's plan will be measured against 11 U.S.C. § 1129's confirmation requirements. However, the debtor's burden is less onerous under Section 362(d)(3)(A) than it is at confirmation; a debtor need not prove that its plan *shall be* confirmed. A mini-confirmation hearing is not required, nor is it appropriate, absent good reason to continue to restrain the lender from exercising its rights. While the debtor's plan does not have to be perfect, the plan, together with the evidence and the debtor's arguments, must delineate a credible path to reorganization. Hurdles to plan confirmation must be addressed in a way that provides the court with grounds to conclude (i) it is more likely than not they will be overcome, and (ii), because there is a time element, they can be overcome promptly. Unless the plan has a true prospect of being confirmed within a reasonable time, or timely payments have been made, a secured creditor should not be compelled to endure further delay, expense, and risk.

Id. at 37.

Here, the Debtor has utterly failed to meet this standard. No evidence has been provided to show that the Debtor will be able to meet its obligations under the Plan. Indeed, the record shows that the Debtor cannot meet its obligations under the Plan. The Plan proposes to pay creditors monthly payments of $56,300 and annual lump sum payments totaling $1,399,000 through 2018, with a final payment of $1,699,000 due in 2019. The operating statements filed by the Debtor show that, since the commencement of this case, the Debtor has generated zero income. While the Debtor asserts that the Property generated $30,000 for the 30 days ending on December 13, 2013, this claimed monthly income, which is prior to the payment of any operating expenses, is 53% of the monthly payments called for under the Plan. Even in the Property's best year of operation, it only generated revenues of $306,000. (Mem. of Law in Opp'n Ex. A, Case No. 13-42125-CEC, ECF No. 29 at 7.) Thus, in its best year, the Property generated an average gross monthly income (prior to the payment of operating expenses) of $25,500, less than half the amount of the monthly Plan payments.

While historical earnings are a factor in determining the feasibility of plan payments, future projections may also be considered. However, the ability to meet plan obligations must be proven with some level of specificity. See Dish Network Corp. v. DBSD N. Am., Inc. (In re DBSD N. Am., Inc.), 634 F.3d 79, 107 (2d Cir. 2010). "In most situations, the time immediately following bankruptcy will call for fairly specific proof of the company's ability to meet its obligations . . .. As one moves further away from the time of confirmation, however, the proof will necessarily become less and less specific." Id. The plan requires monthly payments of $56,300 in tandem with yearly lump sum payments from 2015 to 2019. (Proposed Am. Chapter 11 Plan Dated 12/18/13, Case No. 13-42125-CEC, ECF No. 60.) The Plan projects that the Debtor's monthly income will continuously increase over the life of the plan, although the

Debtor provided no evidence to support these projections. In any event, according to the Debtor's own projections, it will not be generating enough revenue to meet its monthly obligations until somewhere between the 12th and the 24th month of the plan. (Proposed Am. Chapter 11 Plan Case No. 13-42125-CEC, ECF No. 60 at 3) (projecting revenue to be $54,000 a month after 12 months and to be $68,000 a month after 24 months). The Debtor's projected revenue, alone, makes it impossible to conclude that the Plan has a reasonable possibility of being confirmed within a reasonable time of the Plan, based on the fact that the Debtor would not be able to make, at a minimum, its first twelve required monthly payments under the plan. Id. at 3.

Nor has the Debtor provided any proof of its ability to meet the yearly lump sum payments of $1,399,000, beyond listing possible avenues of financing and potential sources of income. The Plan states that the Debtor will generate income to make these payments through

> "income generated by the building (mostly in years 3, 4, 5), investments by various theater and dance companies (year 2, 3, 4, 5), long term leases of portions of the facility (rates in the area are approaching $60[per square foot]), possible investors/partners (unknown but as soon as year 1), refinancing the business as needed (after some changes in infrastructure), income generated by the adjacent lot whose ownership is in dispute, EB-5 Program to finance debt reduction/development, EB-5 is [a] US Government sponsored program where by foreign investors get temporary residency rights in exchange for investments in development projects. The lead example in Brooklyn is the Atlantic Yards development which garnered $228,000,000. That amount is a far cry from the $6,000,000 necessary in this situation."

Id.

The Debtor cannot establish a reasonable possibility of confirming a plan based on the *possibility* of investments or refinancing. The Debtor has not provided any evidence that the income and funding, on which the Plan is based, will in fact be obtained. The Debtor has not

identified any investor or source of financing that has provided a funding commitment; indeed, the Plan describes the sources of investments as "possible investors/partners (unknown but as soon as year 1)." Id. Evidence that the Debtor will be able to obtain "investments by various theater and dance companies" or "long term leases of portions of the facility" is also lacking. Nor does the Debtor show any prospect of refinancing; indeed, the Plan notes that refinancing will take place "after some necessary changes in infrastructure," but provides no information about the changes that would be needed or how they would be funded.

The Plan also states that the Debtor proposes to enter into long term leases to generate the capital necessary to make the lump sum payments under the Plan. The Debtor has not provided any information about this proposed income source other than the unsubstantiated statement that rates in the area are approaching $60 per square foot. The Debtor has certainly not shown that it has an agreement with a proposed long term tenant. To the contrary, the Debtor attached three rental contracts to its Disclosure Statement, all three of which were for seven hour blocks of time. (Proposed Am. Disclosure Statement Exs. A, B, and C, Case No. 13-42125-CEC, ECF No. 59 at 7-18.)

Nor does the Debtor's stated intention to seek an EB-5 investment satisfy the Debtor's burden to show that the Plan has a reasonable possibility of being confirmed within a reasonable time. EB-5 refers to 8 U.S.C. § 1153(b)(5), which provides for the granting of immigration visas to aliens who invest no less than a specified amount in a new commercial enterprise. See 8 U.S.C. §§ 1153(b)(5). At the December 18, 2013 hearing, Mr. Richmond explained that he had not applied for the EB-5 program because applications are not accepted until the beginning of the year. However, it appears that the Debtor would not be the proper party to make such an application; an EB-5 application would be made by a foreign investor who desired to invest in

the Debtor through this program.  See 8 C.F.R. § 204.6 (providing that a petition must be filed by

the Alien Entrepreneur).  The Debtor has not identified any foreign investors who propose to

invest in the Debtor.  Also, the Debtor has not shown that it would qualify as a "new commercial

enterprise".  8 U.S.C. § 1153(b)(5)(A) ("Visas shall be made available . . . to qualified

immigrants seeking to enter the United States for the purpose of engaging in a *new commercial

enterprise*") (emphasis added).  A "new commercial enterprise" may consist of :

> (1) The creation of an original business;
> (2) The purchase of an existing business and simultaneous or subsequent restructuring or reorganization such that a new commercial enterprise results; or
> (3) The expansion of an existing business through the investment of the required amount, so that a substantial change in the net worth or number of employees results from the investment of capital. Substantial change means a 40 percent increase either in the net worth, or in the number of employees, so that the new net worth, or number of employees amounts to at least 140 percent of the preexpansion net worth or number of employees . . .. In the case of a capital investment in a troubled business, employment creation may meet the criteria set forth in 8 C.F.R. § 204.6(j)(4)(ii).[7]

8 C.F.R. § 204.6(h).  It is by no means clear that the Plan would create an original business or

provide for the degree of restructuring, or reorganization, necessary under

8 C.F.R. § 204.6(h)(2).  See 22 I. & N. Dec. 158, 166 (B.I.A. 1998) (holding that the petitioner

had not shown the degree of restructuring and reorganization required where the new enterprise

simply replaced the former owner, made cosmetic changes to the décor, and implemented a new

marketing strategy).   Nor is it clear that the Plan will result in the expansion necessary to qualify

the Debtor as an investable existing business.  The Debtor may qualify as a "troubled business,"

but even if it did, it would still require an interested foreign investor.  Even if the Debtor found

---

[7] 8 C.F.R. § 204.6 (j)(4)(ii) states: "Troubled business. To show that a new commercial enterprise which has been established through a capital investment in a troubled business meets the statutory employment creation requirement, the petition must be accompanied by evidence that the number of existing employees is being or will be maintained at no less than the pre-investment level for a period of at least two years."

an investor interested in participating in the EB-5 program, it has not shown that an investment would be likely received prior to January 1, 2015, when the first lump sum payment would be due.

Finally, there is no possibility that the Debtor will generate any income from the adjacent lot, as proceedings in state court have determined that the Debtor has no ownership interest in the lot. See Richmond v. Miele, 30 A.D.3d 575 (N.Y. App. Div. 2006) (holding that Mr. Richmond's option to purchase the adjacent lot expired, as he did not exercise the option within the specified time); see also Union St. Tower, LLC v Richmond, 84 A.D.3d 784 (N.Y. App. Div. 2011) (applying the doctrine of res judicata to bar Mr. Richmond's counterclaim asserting the right to redeem the disputed lot).

B. <u>Collateral Attack of the Foreclosure Judgment is Barred by the Rooker-Feldman Doctrine and Res Judicata</u>

The Debtor claims that New York State Supreme Court, Kings County (the "Kings County Supreme Court"), which issued the Foreclosure Judgment, lacked the jurisdiction to enter that judgment. The Debtor contends that this Court therefore has authority to set aside the Foreclosure Judgment. The Debtor's argument reflects a misunderstanding of the applicable provisions of New York law. Moreover, in any event, the Rooker-Feldman doctrine and principles of res judicata prevent this Court from reviewing the validity of the Foreclosure Judgment.

New York Civil Practice Law and Rules ("CPLR") § 3215(c) provides:

> If the plaintiff fails to take proceedings for the entry of judgment within one year after the default, the court shall not enter judgment but shall dismiss the complaint as abandoned, without costs, upon its own initiative or on motion, unless sufficient cause is shown why the complaint should not be dismissed.

N.Y. C.P.L.R. § 3215(c). The Debtor alleges that under this provision the last day P.B. could have sought a judgment in the foreclosure action was May 12, 2009, which is more than five months prior to the date P.B. made its default judgment motion. However, CPLR § 3215(c) is not a mandatory provision. Maidenbaum v. Ellis Hospital, 47 A.D.2d 683, 684 (N.Y. App. Div. 1975) ("[I]t is readily apparent that a dismissal is not mandatory and, indeed, may not be had where the plaintiff establishes sufficient cause for delay"). Thus, it would appear that the Kings County Supreme Court had discretion to entertain P.B.'s default judgment motion.

However, even if the Foreclosure Judgment was entered in violation of CPLR § 3215, it cannot be set aside by this Court. The Rooker-Feldman doctrine bars "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 284 (2005). "Underlying the *Rooker–Feldman* doctrine is the principle, expressed by Congress in 28 U.S.C. § 1257, that within the federal judicial system, only the Supreme Court may review state-court decisions." Hoblock v. Albany County Bd. of Elections, 422 F.3d 77, 85 (2d Cir. 2005). Rooker–Feldman applies to cases satisfying a four part test: (1) the federal-court plaintiff lost in state court; (2) the plaintiff "must complain of injuries caused by a state-court judgment;" (3) the plaintiff "must invite district court review and rejection of that judgment;" and (4) "the state-court judgment must have been rendered before the district court proceedings commenced." Green v. Mattingly, 585 F.3d 97, 101 (2d Cir. 2009). Rooker-Feldman clearly applies to the instant case; the Debtor lost in state court; the Debtor is complaining of injuries caused by the Foreclosure Judgment; the Debtor is requesting that this Court review and set aside the Foreclosure Judgment; and the Foreclosure Judgment was issued before the Debtor's

bankruptcy case commenced. This Court, therefore, lacks subject matter jurisdiction to consider any challenge to the Foreclosure Judgment, which may be asserted only in state court.

Furthermore, parties seeking to overturn a state court judgment in federal court must also overcome res judicata. Id. ("*Rooker-Feldman* does not otherwise override or supplant preclusion doctrine . . .."). "Res judicata, or claim preclusion, operates to prevent a party from re-litigating a claim after the claim has already been decided by a court of competent jurisdiction." Charell v. Gonzalez (In re Gonzalez), 241 B.R. 67, 72 (S.D.N.Y. 1999); see also Brown v. Felsen, 442 U.S. 127, 131 (1979); Monahan v. New York City Dep't of Corr., 214 F.3d 275, 284 (2d Cir. 2000). This doctrine "ensures the finality of decisions." Brown, 442 U.S. at 131. To determine the preclusive effect of a state court decision, a federal court must apply the standard used by the state in which the decision was rendered. 28 U.S.C. § 1738; Exxon Mobil, 544 U.S. at 293; In re Fischer, 252 B.R. 603, 613 (Bankr. E.D.N.Y. 2000). Under New York's doctrine of res judicata "a final judgment on the merits of an action precludes the parties or their privies from relitigating claims that were or could have been raised in that action." Marvel Characters, Inc. v. Simon, 310 F.3d 280, 286-87 (2d Cir. 2002). "This doctrine also applies to defenses that could have been litigated, including defenses to a foreclosure." Yeiser v. GMAC Mortg. Corp., 535 F. Supp. 2d 413, 421 (S.D.N.Y. 2008). Therefore, because the Debtor was a party to the state court foreclosure action, and because the Debtor could have raised its CPLR § 3215(c) defense in that action, the Debtor is barred from asserting it at this juncture.

The Debtor contends that the Kings County Supreme Court was not a court of competent jurisdiction, and that the Debtor may therefore collaterally attack the Foreclosure Judgment in this Court. The Debtor cites the United States Supreme Court's decision in Heiser v. Woodruff for the proposition that a judgment may be collaterally attacked in bankruptcy court when the

court that issued the judgment lacked jurisdiction. Heiser v. Woodruff, 327 U.S. 726, 736 (1946) ("Undoubtedly, since the Bankruptcy Act authorizes a proof of claim based on a judgment, such a proof may be assailed in the bankruptcy court on the ground that the purported judgment is not a judgment because of want of jurisdiction of the court which rendered it over the persons of the parties or the subject matter of the suit, or because it was procured by fraud of a party" (citations omitted)).

      This argument reflects a fundamental misunderstanding of the concept of jurisdiction. The Debtor's argument that the Foreclosure Judgment was entered in violation of CPLR § 3215(c) is not a challenge to the jurisdiction of the court issuing the Foreclosure Judgment. "Jurisdiction" refers to "the courts' statutory or constitutional *power* to adjudicate the case." Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 89 (1998). The Kings County Supreme Court derives its authority from the New York State Constitution. See N.Y. Const. art. VI, § 7. The supreme courts of the State of New York have "general original jurisdiction in law and equity". Id.; Condon v. Associated Hospital Service, 287 N.Y. 411 (N.Y. 1942) (holding that the supreme court is presumed to have jurisdiction of a cause of action unless the contrary plainly appears). Even if the entry of the Foreclosure Judgment was an error under CPLR § 3215, such an error would not divest the Kings County Supreme Court of authority to adjudicate the foreclosure action against the Debtor or to enter the Foreclosure Judgment; it would merely provide grounds for an appeal. Because the Kings County Supreme Court was vested with the power to adjudicate the foreclosure action, the Debtor's claim that the decision to enter the Foreclosure Judgment was incorrect does not constitute a jurisdictional challenge.

      Even if res judicata did not apply in this case, the Rooker-Feldman doctrine would still prevent the Debtor from attacking the Foreclosure Judgment in bankruptcy court. Woodruff may

16

set forth an exception to the applicability of res judicata, but provides no exception to the Rooker-Feldman doctrine.

For all of these reasons, the Rooker-Feldman doctrine and res judicata prevent the Debtor from challenging the Foreclosure Judgment in this Court.

## CONCLUSION

For the foregoing reasons, P.B.'s motion to lift the automatic stay is granted. A separate order will issue.



**Dated: Brooklyn, New York**
**February 28, 2014**

_____
**Carla E. Craig**
**United States Bankruptcy Judge**